## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| HOLLY E.[1], | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 22-CV-1026-SMY |
| | ) | |
| KILOLO KIJAKAZI, | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

**YANDLE, District Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff Holly E. seeks judicial review of the final agency decision denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") pursuant to 42 U.S.C. § 423.

### Procedural History

Plaintiff applied for DIB and SSI[2] on December 6, 2019, alleging a disability onset date of June 1, 2019 in both applications (Tr. 111, 305, 311). Her claim was initially denied on August 24, 2020 (Tr. 124, 186) and denied again on reconsideration on October 23, 2020 (Tr. 161-162, 197).

---

[1] Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. *See* Fed.R.Civ.P. 5.2(c) and the Advisory Committee Notes.

[2] The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. Part 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. § 1382, et seq., and 20 C.F.R. Part 416. For purposes of analyzing Plaintiff's disability, the DIB and SSI statutes are identical and so this Court will not undertake separate analyses of Plaintiff's applications.

Plaintiff requested an evidentiary hearing which took place on March 23, 2021, and was continued on July 13, 2021 (Tr. 42-73, 74-110). Following the hearing, the Administrative Law Judge ("ALJ") denied Plaintiff's applications on August 2, 2021 (Tr. 19-41). The Appeals Council denied Plaintiff's request for review on March 15, 2022, making the ALJ's decision the final agency decision subject to judicial review (Tr. 10-15).

## **Issues Raised by Plaintiff**

Plaintiff raises the following issues for judicial review:

1.  The ALJ erred by failing to explain why he decided that Plaintiff could frequently, rather than occasionally, handle, finger, and feel with her hands following spinal cord damage.

2.  The ALJ erred by failing to conclude that Plaintiff had no severe mental impairment despite treatment for depression, a diagnosis of major depressive disorder, and multiple opinions that Plaintiff suffered from mental illness.

## **Legal Standard**

To qualify for disability insurance benefits, a claimant must be disabled within the meaning of the applicable statutes. Under the Social Security Act, a person is disabled if he or she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A).

In determining whether a claimant is disabled, the ALJ considers the following five questions in order: (1) Is the claimant presently unemployed? (2) Does the claimant have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific

impairments enumerated in the regulations? (4) Is the claimant unable to perform his or her former occupation? and (5) Is the claimant unable to perform any other work?  *See* 20 C.F.R. § 404.1520.  An affirmative answer at either step 3 or step 5 leads to a finding that the claimant is disabled.  A negative answer at any step, other than at step 3, precludes a finding of disability.  The claimant bears the burden of proof at steps 1–4.  Once the claimant shows an inability to perform past work, the burden then shifts to the Commissioner to show the claimant's ability to engage in other work existing in significant numbers in the national economy.  *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

"The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive...."  42 U.S.C. § 405(g).  Thus, the Court is not tasked with determining whether Plaintiff was disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.  *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

In reviewing for substantial evidence, the Court considers the entire administrative record, but does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.  *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019).  At the same time, judicial review is not abject; the Court does not act as a rubber stamp for the Commissioner.  *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010).

### Decision of the ALJ

The ALJ followed the five-step analytical framework with respect to Plaintiff's application.  He determined that Plaintiff had not worked at the level of substantial gainful

activity since the alleged onset date (Tr. 24).  He found that Plaintiff had the severe impairments of obesity, degenerative disc disease, disorder of the lumbar and cervical spine, dysfunction of the left hip, disorder of the thyroid, and carpal tunnel syndrome (Tr. 25), but concluded that she did not have an impairment or combination of impairments that met or medically equaled the severity of the impairments listed in 20 C.F.R. Part 404 (Tr. 26).

The ALJ concluded as follows regarding Plaintiff's Residual Functional Capacity ("RFC"):

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except she can never climb ladders, ropes and scaffolds, and can occasionally climb ramps and stairs. She can occasionally balance on narrow, slippery, or erratically moving surfaces with the use of a handheld assistive device. She can occasionally stoop, crouch, kneel but never crawl. She can handle objects, that is gross manipulation frequently with the bilateral upper extremities, finger that is fine manipulation of items no smaller than the size of paper clip frequently with the bilateral upper extremities, and feel frequently with the bilateral upper extremities. She is limited to jobs that can be performed while using a handheld assistive device required at all times when standing but the contralateral upper extremity can be used to lift and carry up to exertional limits. She can have no use of hazardous machinery, no exposure to unshielded moving mechanical parts, no exposure to unprotected heights, no driving of motor vehicles as part of the work function, and no exposure to extreme vibrations.

(Tr. 27)

The ALJ credited the Vocational Expert's testimony and determined that Plaintiff was unable to perform any past relevant work, including work as a dietary aide (Tr. 32).  However, he ultimately concluded that Plaintiff was not disabled because based on the RTC of sedentary exertional work, she was able to perform the jobs of telephone quotation clerk, charge account clerk, and order clerk food and beverage (Tr. 32-33).

The ALJ considered and discussed the findings of Plaintiff's medical providers, including that she had neck pain radiating into the arms, hands, and fingers with intermittent weakness (Tr. 29), that she underwent a cervical MRI that showed evidence of abnormal signal within the cervical cord (Tr. 30), and that she had a nerve conduction study/EMG that showed mild bilateral carpal tunnel syndrome, right more than left, and mild motor unit changes and reduced recruitment at C6-7 distribution, right more than left (Tr. 30).

### The Evidentiary Record

The Court reviewed and considered the entire evidentiary record in preparing this Memorandum and Order. The following summary of the record is directed to the points raised by Plaintiff.

### Agency Forms

Plaintiff was born in 1980 and was 39 years old on the alleged onset date of June 1, 2019 (Tr. 111). She alleges that she suffers from, "degenerative cervical disc disease, arthritis in back, fused C3-C6 in neck, severe central canal stenosis, depression, anxiety, incontinence bladder issues from spine, heavy legs and numb arms, balance issues, and neuropathy" (Tr. 111-112).

### Evidentiary Hearing

There were two evidentiary hearings – on March 23, 2021, and July 13, 2021 (Tr. 42-73, 74-110). Plaintiff was represented by counsel at her hearing on March 23, 2021 (Tr. 76) and testified to the following: she last worked as a dietary aide in 2018 (Tr. 85-86). Since that time, she had undergone two surgeries, a laminectomy with fusion and an anterior cervical discectomy and fusion (Tr. 87). The surgeries were somewhat unsuccessful and she had permanent symptoms of spinal cord damage (Tr. 88). These symptoms are especially

pronounced in her hands, where she has no feeling, cannot cut, and feels burning and tingling (Tr. 90). Her left hand is like a claw (Tr. 91). She cannot hold onto items and has weakness in her arms (Tr. 91-92). She cannot type on a computer (Tr. 93). She has issues with reaching and picking up items (Tr. 95-96).

Vocational Expert Deborah Ann Determan ("VE") testified that Plaintiff could no longer perform her past work as a dietary aide (Tr. 103). In response to hypotheticals posed by the ALJ, the VE testified that Plaintiff could perform several jobs (Tr. 102-107) but if Plaintiff was limited to sedentary exertional levels and had only "occasional" use of her hands, she would be precluded from working:

> Q. All right. And for my next hypothetical, I again want you to assume an individual of the Claimant's age, education, work experience, going to be able to perform sedentary work; going to have all the limitations I just articulated in my prior hypothetical, but the, but the individual's ability to handle, finger and feel, as I've defined those terms previously in these hypotheticals, will be reduced from a frequent basis to an occasional basis. So with occasional handling, fingering, feeling as I've articulated, would such an individual be able to perform any competitive work in the national economy with all of these limitations?
>
> A. Your Honor, the combination of limitations, with the occasional handling, fingering and feeling, is going to preclude all competitive, unskilled, sedentary work.

(Tr. 107)

Following this exchange, Plaintiff's counsel posed questions to the VE regarding absenteeism and the hearing concluded (Tr. 108-110).

The ALJ held a supplemental hearing on July 13, 2021, with an additional medical expert, Dr. Steven S. Goldstein (Tr. 45). Once again, Plaintiff testified that her hands remained numb and she could not feel textures or hot or cold (Tr. 53). Dr. Goldstein opined that she would be able to function at a "sedentary level" but that "no sensory exams [were] done so it

was difficult afterwards to know for sure how she's doing" (Tr. 60-61). He acknowledged that

Plaintiff had "deteriorated after the surgery" (Tr. 61). With respect to Plaintiff's hands, Dr.

Goldstein testified that he had no "fine examinations" and had no "examination of the

sensation" from which to opine about the condition of Plaintiff's hands (Tr. 63). VE Deborah

Ann Determan opined that based on the ALJ's proposed RFC, Plaintiff could perform several

sedentary jobs (Tr. 67). She then responded to a hypothetical from the ALJ which was also

posed in the first hearing:

> Q. And if you – well, for a second hypothetical, I want you to once again
> assume an individual of the Claimant's age, education and work
> experience, who, once again, is going to be able to perform sedentary
> work. That individual would have all the same limitations I just
> articulated and I want to change the manipulatives that I have, the
> handling, the fingering, the feeling; we're going to stick with those terms
> as they're defined but I'm going to change the frequency of the ability to
> manipulate, handle, finger and feel from a frequent basis to occasional
> so this individual is going to be able to occasionally handle, finger and
> feel, as those terms are defined. If I reduce that frequency to occasional,
> would there remain any work in the competitive economy?
>
> A. Your Honor, under that hypothetical, there would only be one
> occupation that would be consistent with this hypothetical. I can give
> you that information if you want it.
>
> Q. Is that the old surveillance system monitor?
>
> A. Yeah. The callout operator.

(Tr. 68)

The VE expressed some concern with how the job had changed since 1977, by requiring far

more computer use (Tr. 69). There were no follow-up questions regarding how issues with

the hands may complicate the use of a computer (Tr. 69-73).

### Relevant Medical Records[3]

On July 31, 2019, Plaintiff first went to Clinton County Rural Health and complained of a sensory deficit in her hands.  She was diagnosed with "paresthesia of both hands" (Tr. 489).  She underwent a brain MRI that found "few nonenhancing small bright foci in the left hemispheric subcortical white matter," with a possible "differential diagnosis [including] demyelinating disorder" (Tr. 491-492).

On August 21, 2019, Plaintiff visited Dr. Reuben M. Valenzuela with complaints about dropping things in her left hand and "acute weakness of her left arm and hand."  Dr. Valenzuela reviewed Plaintiff's brain MRI and noted "a few nonenhancing T2 flair hyperintense signal in the subcortical areas that are nonspecific" (Tr. 669).

On August 28, 2019, Plaintiff underwent a cervical MRI that showed: "Multilevel degenerative changes in the cervical spine with severe canal stenosis at C4-05 and moderate to severe canal stenosis at C5-C6. Circumferential effacement of the thecal sac and mass effect upon the cord, more so at C4-05. Although focal myelomalacia C5-C6 segment. More ill-defined cord signal abnormality at C4-05 could reflect myelomalacia or edema depending on the acuity of the patient's symptoms" (Tr. 682-683).

On September 5, 2019, Plaintiff saw Dr. Gordon K.T. Chu who reviewed the cervical MRI and noted "compression and spinal cord at those levels with signal changes within the spinal cord".  On examination, he found that Plaintiff's "strength decreased grip bilaterally" and "sensation decreased from approximately the shoulder down" (Tr. 687, 689).  He noted

---

[3] For the purposes of this analysis, Plaintiff's primary impairment is spinal cord damage that causes difficulties with using her hands.

that Plaintiff had "many months of worsening cervical myelopathy" with a spinal cord compression.  He recommended a posterior cervical laminectomy (Tr. 635).[4]

On September 30, 2019, Plaintiff saw Diana D. Brackett, R.N., and reported that the "numbness in her hands she had prior to surgery is still present and possibly increased" (Tr. 641).  Plaintiff also saw Dr. Gordon K.T. Chu on that date and made the same complaints about her hands.  Dr. Chu noted, "Unfortunately the [surgery] did not improve her symptoms" (Tr. 642).

On October 28, 2019, Plaintiff saw Dr. Gordon K.T. Chu and reported that there had been "some improvement" with the numbness but that her left side "continues to be worse" (Tr. 650).  On examination, Dr. Chu found "strength decreased with left grip" and "sensation decreased in both arms" (Tr. 651).

Plaintiff underwent a second cervical fusion surgery with partial thyroidectomy in November 2019 (Tr. 615-616).

On March 2, 2020, Plaintiff saw Physician Assistant Sally A. Vespa for a follow up visit (Tr. 658).  She complained that she had felt "zaps" in her hands and that "her hands feel like mummy hands" (Tr. 658).  She was diagnosed with a disorder of the hand and referred to occupational therapy (Tr. 662).

On August 12, 2020, Plaintiff had a 30-minute physical consultative examination with Dr. Adrian Feinerman, who noted "degenerative disc disease" (Tr. 726-728).  It does not appear that Dr. Feinerman addressed Plaintiff's hand complaints.

---

[4] Although the operative report does not appear to have been made a part of the record, Plaintiff did have the surgery.

Plaintiff's treating Physician's Assistant, Amber Poettker, prepared a treating source statement in November 2020 in which she opined that Plaintiff had limitations with reaching, handling, and fingering (Tr. 882).

On May 12, 2021, Plaintiff underwent an MRI of her cervical spine that showed, "Evidence of abnormal signal within the cervical cord consistent with multifocal areas of myelopathy or demyelination" (Tr. 1139).

On May 19, 2021, Plaintiff saw Dr. Amit Wasudeo for follow up testing. Dr. Wasudeo noted grade three weakness in Plaintiff's left biceps, triceps, and wrists; grade four weakness in grip strength on the left hand; grade four weakness in her right biceps; and grade five weakness in her right wrist (Tr. 1209). She diagnosed "cervical radiculopathy" and "myelopathy concurrent with and due to spinal stenosis of cervical region" (Tr. 1209).

On July 8, 2021, Plaintiff underwent a nerve conduction study that found "mild bilateral carpal tunnel syndrome, right more than left side" (Tr. 1228).

**State Agency Consultants' Opinions**

The ALJ discounted the findings of Robert Vautrain, M.D. and Sai Nimmagadda, M.D., finding they were "inconsistent with evidence at hearing level" (Tr. 30-31). The ALJ considered the findings of the internal medicine consultant, Adrian Feinermann, but found they were "not persuasive as they are inconsistent with rest of the medical evidence record" (Tr. 31).

<u>Discussion</u>

The ALJ did not adequately address the hand issues Plaintiff has associated with myelopathy (a condition where a compressed spinal cord causes nerve issues), which the VE initially found would have resulted in a finding of her disability (Tr. 107). At the first hearing,

Plaintiff repeatedly discussed having no feeling in her hands and that they "tingle, lock up, and swell." The ALJ credited this testimony in his opinion (Tr. 28).  The ALJ further also noted Plaintiff's testimony that has she problems with loss of feeling in her hands, which makes it hard to even dress herself (Tr. 28).  Plaintiff reiterated these issues in her second hearing. Likewise, Plaintiff wrote in her initial application for disability, "My myelopathy extremely affects my hands" and stated that she cannot cut up food, use a can opener, or pick up a coin (Tr. 358, 362).

The ALJ noted that the medical evidence documents Plaintiff's "numbness in her hands" and "neck pain radiating into her arms, hands" (Tr. 29) and considered the medical source statement of Plaintiff's physician assistant, Amber Poettker, who indicated that Plaintiff can only "occasionally reach and handle, rarely finger, and never feel with the upper extremities" (Tr. 31).  He credited a cervical MRI that showed "evidence of abnormal signal within the cervical cord consistent with myelopathy" (Tr. 30).  But despite all of the above, the ALJ found that, "[Plaintiff] can handle objects, that is gross manipulation frequently with the bilateral upper extremities, finger that is fine manipulation of items no smaller than the size of paper clip frequently with the bilateral upper extremities, and feel frequently with the bilateral upper extremities" (Tr. 28).

This Court finds that there a logical disconnect between Poettker's opinion that Plaintiff can only "occasionally" reach and "never feel" to the ALJ's conclusion that Plaintiff can "feel frequently with the bilateral upper extremities." *Vilano v. Astrue,* 556 F.3d 558, 562 (7th Cir. 2009) (noting that the "ALJ is not required to discuss every piece of evidence, but must build a logical bridge from evidence to conclusion").  In reaching his conclusion, the ALJ was required to "confront evidence that does not support his conclusion and explain why it was

rejected." *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004).  Here, the ALJ did not fully explain his reasons for discounting Plaintiff's testimony about her severe limitations.  He noted only that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms."  And he discounted the "limiting effects" for unknown reasons he vaguely describes as "not entirely consistent with the medical evidence." (Tr. 28-29).  *Terry v. Astrue,* 580 F.3d 471, 477 (7th Cir. 2009) (The ALJ "must justify the credibility finding with specific reasons supported by the record").

Defendant points to a purportedly normal exam with Dr. Feinerman (Doc. 18, p. 10), but the ALJ found that Dr. Feinerman's examination was "not persuasive" and "inconsistent" with the "grip problems documented [elsewhere]" (Tr. 31).  Similarly, the ALJ acknowledged Poettker's opinion was "partially persuasive," but still found Plaintiff could use her hands "frequently" (Tr. 31).

Although the ALJ brought in Dr. Goldstein for the second hearing, Dr. Goldstein testified that he did not have sufficient examination information ("fine examinations") to opine fully on Plaintiff's hand limitations.  As such, the ALJ should have recognized the need for more detailed testing of Plaintiff's hands.  He apparently did not consider Dr. Wasudeo's findings of arm and hand weakness and myelopathy in reaching his RFC or overall findings (Tr. 30).

While Defendant argues that there is substantial evidence for the ALJ's findings regarding the Plaintiff's hands because examinations showed mostly normal functioning or only mild deficits (Doc. 18, p. 9),   those examinations involve findings with respect to "grip strength" or "reflexes" and are not adequately discussed in the context of Plaintiff being able to "occasionally" or "sometimes" use her hands as opposed to "frequently" being able to do

so.  *Vilano,* 556 F.3d at 562.  These were also the tests that Dr. Goldstein testified were insufficient to fully opine about Plaintiff's hand condition during the July 2021 hearing.  The ALJ found Dr. Goldstein's "assessment persuasive as it is supported by [a] review of the entire medical evidence record." (Tr. 32).

Finally, Defendant argues that even if the ALJ failed to make this logical bridge, it is harmless error because the VE identified a single job, callout operator, in the national economy that Plaintiff could have performed even with her hand limitations (Doc. 18, pp. 1, 6).  But the VE noted that the callout operator job was last reviewed in 1977 and would now "certainly . . . require computer use" (Tr. 69).  Thus, it is unclear that the VE would still find that that would be an appropriate job for Plaintiff given the extent of hand limitations noted in the full record.  *Yurt v. Colvin,* 758 F.3d 850, 857 (7th Cir. 2014) (the ALJ's RFC assessment and the hypothetical question posed to the VE must both incorporate all of the limitations that are supported by the record).  Significantly, during the first hearing, the same VE opined that, "The combination of [Plaintiff's] [sedentary] limitations, with the occasional handling, fingering and feeling, is going to preclude all competitive, unskilled, sedentary work" (Tr. 107).  As such, a remand is appropriate to address this apparent contradiction in the VE's testimony as well; it is unclear whether Plaintiff's sedentary exertional level coupled with occasional use of hands precludes her working in the national economy.

For the foregoing reasons, remand is appropriate in this case for the ALJ to clarify the reasons he found Plaintiff could feel frequently with her hands and that she could "frequently" perform gross manipulation with the bilateral upper extremities despite Plaintiff's testimony,

the medical evidence in the record, and the VE's initial finding that Plaintiff only being able to use her hands "occasionally" with a sedentary exertional level precluded her from working.[5]

### Conclusion

After careful review of the record, the Court finds that the ALJ committed errors of law.  Therefore, the final decision of the Commissioner of Social Security denying Plaintiff's application for disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. § 405(g). The Clerk of Court shall enter judgment in favor of Plaintiff.[6]

**IT IS SO ORDERED.**

**DATED:  September 25, 2023**

**STACI M. YANDLE**
**United States District Judge**

---

[5] Because the Court has determined that remand is necessary, it need not address Plaintiff's remaining arguments. Plaintiff may raise those issues directly with the ALJ on remand.
[6] This Memorandum and Order should not be construed as an indication that the Court believes that Plaintiff is disabled or that she should be awarded benefits. The Court has not formed any opinions in that regard and leaves those issues to be determined by the Commissioner after further proceedings.